UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE SHERMAN REED AND YVETTE REED, ) ) ) Debtors. ) ) _____ ) ) SANDRA SUTTON, ) ) Appellant-Creditor, ) ) v. ) ) SHERMAN REED AND YVETTE REED, ) ) Appellees-Debtors. ) | No. 13 C 05660 Judge Edmond E. Chang |

## MEMORANDUM OPINION AND ORDER

Creditor Sandra Sutton appeals from the bankruptcy court's orders denying Sutton's motion to lift the automatic stay and confirming Sherman and Yvette Reed's Chapter 13 bankruptcy plan. For the reasons discussed below, the bankruptcy court's orders are affirmed.[1]

## I. Background

The Reeds filed a Chapter 13 bankruptcy petition in June 2012. R. 1-3, Chapter 13 Voluntary Petition [Dkt. 1]. One of the reasons for their Chapter 13 filing was a pending foreclosure dispute they had with Sutton over the mortgage on the Reeds' six-unit apartment building; Sutton is the Reeds' mortgage lender for the

---

[1]The Court has subject matter jurisdiction over this bankruptcy appeal under 28 U.S.C. § 158(a)(1). Citations to this Court's docket, including the Record on Appeal, are noted as "R. [docket entry number]," followed by a description of the document in that entry. When appropriate, the Court will also include the bankruptcy court's docket entry number ("Dkt. [number]") from *In re Reed*, No. 12-22803 (Bankr. N.D. Ill.).

property. *See* R. 9, Appellees' Br. at 1-2; *see also* R. 1-3, Adversary Compl. [Dkt. 23] at 2; R. 1-3, Mot. Relief from Stay [Dkt. 38] at 1. The Reeds acknowledged that they owed Sutton $250,000 on the mortgage, but they wanted to modify the mortgage through Chapter 13 bankruptcy (this is known as a "cram down" in the bankruptcy world). *See* Adversary Compl. [Dkt. 23] at 3. The Reeds argued that by 2012, the property had lost more than half of its value, leaving no equity in the property. *See id.*

During the bankruptcy proceedings, the Reeds filed multiple proposed bankruptcy plans, along with amended schedules listing their income and expenses. Sutton likewise filed multiple objections to the Reeds' proposed plans and also a motion to lift the automatic stay so that she could proceed with her foreclosure action against the Reeds.[2] *See* Mot. Relief from Stay [Dkt. 38]. Before the bankruptcy court addressed these proposed plans and objections, it first ordered the Chapter 13 Trustee to make an adequate-protection payment to Sutton from "all amounts held by the Trustee on behalf of the Debtors." R. 1-3, Order Enforcing Required Adequate Protection Payment [Dkt. 102]; *see also* R. 1-4, Sixth Am. Plan [Dkt. 130] at 6 (stating that Sutton received an adequate-protection payment of $32,836). Then, in a valuation hearing, the bankruptcy court also determined that the current value of the Reeds' apartment-building property was $140,000. *See* Sixth Am. Plan [Dkt. 130] at 6. In other words, instead of owing Sutton the

---

[2]As necessary, the Court will discuss further details about these proposed plans and objections in the Analysis section below.

$250,000 balance on the mortgage, the Reeds would now owe Sutton $140,000 (plus interest)—the current value of the property.³

Finally, the bankruptcy court confirmed the Reeds' seventh and final plan—their "Sixth Amended Plan"—on July 11, 2013, and denied Sutton's motion to lift the stay. *See* R. 1-4, Order Confirming Plan [Dkt. 139]; *see also* Order Denying Mot. Relief from Stay, *In re Reed*, No. 12-22803 (Bankr. N.D. Ill. July 11, 2013), ECF No. 138.⁴ During the confirmation hearing, the bankruptcy court found that "based on a lot of history in this courtroom that the Reeds are making a good faith effort to confirm a Chapter 13 plan that does treat their creditors appropriately." R. 4, 7/11/13 Tr. [Dkt. 150] at 16. Under the confirmed plan, the Reeds will repay Sutton $140,000 on the mortgage, $12,121.88 for post-filing real-estate tax payments that Sutton made on the property, and 5% interest, for a total of $172,224.20. Sixth Am. Plan [Dkt. 130] at 6. Unsecured creditors will then receive, at a minimum, 2.59% of their claims. *See* R. 1-4, Order Modifying Plan [Dkt. 140].

Sutton filed her notice of appeal on July 22, 2013. R. 1, Notice of Appeal [Dkt. 143].

## II. Standard of Review

A federal district court has jurisdiction, under 28 U.S.C. § 158(a), to hear appeals from the rulings of a bankruptcy court. On appeal, the district court reviews

---

³To be more precise, the portion of the mortgage that is now "secured" debt is $140,000, and the balance (in this case, $110,000) is "unsecured" debt. *See* 11 U.S.C. § 506(a) ("[A]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.").

⁴Although Sutton also appeals from this order, she did not include it in the Record on Appeal. *See* R. 1, Designation of Record & Issues on Appeal [Dkt. 147] at 1.

3

the bankruptcy court's legal findings de novo and its factual findings for clear error. *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014). A bankruptcy court's finding that a debtor's plan was proposed in good faith is a finding of fact that this Court evaluates for clear error only. *In re Smith*, 848 F.2d 813, 816 n.2 (7th Cir. 1988). Under that standard, an appellate court will not reverse simply because it would have decided the case differently; instead, a reviewing court must ask whether, considering all of the evidence, "it is left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks and citation omitted).

Additionally, decisions left to the discretion of the bankruptcy court are reviewed "only for an abuse of discretion." *Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 588 (7th Cir. 2009). This is a difficult standard to meet: "a court abuses its discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004). Appellate courts review a bankruptcy court's ruling on whether to lift the automatic stay for abuse of discretion and its underlying factual findings for clear error. *In re Alexander*, 435 F. App'x 563, 564 (7th Cir. 2011) (citing *Colon v. Option One Mortg. Corp.*, 319 F.3d 912, 916 (7th Cir. 2003)).

### III. Analysis

On appeal, Sutton contends that the bankruptcy court erred in two ways: (1) by confirming the Reeds' Chapter 13 plan, and (2) by denying Sutton's motion to

lift the stay. Although the analysis of these two issues overlaps, the Court addresses each issue in turn below.

## A. Confirmation of Plan

Sutton argues that the bankruptcy court was wrong to confirm the Reeds' Sixth Amended Plan because the Reeds proposed the plan in bad faith. R. 8, Appellant's Br. at 11-17. The obligation of good faith is imposed on the debtor at two stages of a Chapter 13 proceeding. First, the debtor must file a Chapter 13 *petition* in good faith, and next, the debtor must file a Chapter 13 *plan* in good faith. *In re Smith*, 286 F.3d 461, 465 (7th Cir. 2002); *see also* 11 U.S.C. § 1325(a)(3), (7). When reviewing whether a debtor filed a plan in good faith, the court asks of the debtor: "Is he really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?" *In re Smith*, 286 F.3d at 466. This is a question of fact that the court considers "based on the totality of the circumstances surrounding the proposed plan." *Id.* The Seventh Circuit has articulated a non-exclusive list of factors that courts should consider in analyzing the totality of the circumstances: "(1) whether the plan states the secured and unsecured debts of the debtor accurately; (2) whether the plan states the expenses of the debtor accurately; (3) whether the percentage of repayment of unsecured debts is correct; (4) whether inaccuracies in the plan amount to an attempt to mislead the bankruptcy court; and (5) whether the proposed payments indicate a fundamental fairness in dealing with creditors." *Id.* at 466 n.3 (citing *In re Rimgale*, 669 F.2d 426, 432-33 (7th Cir. 1982)). The party alleging bad faith or seeking reconsideration of a good-faith finding has

the burden of showing that the bankruptcy court erred. *See Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 939 (7th Cir. 2006); *see also In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992).

Most of Sutton's objections to the Sixth Amended Plan stem from alleged discrepancies between the Reeds' plan and their 2012 federal income tax return. First, pointing to a discrepancy between the Reeds' claimed monthly expenses in their amended Bankruptcy Schedule J and those same expenses as listed in their 2012 tax return, Sutton argues that the Reeds inflated their property expenses in the Sixth Amended Plan. *See* Appellant's Br. at 14. But the Reeds' attorney adequately explained this alleged discrepancy at the confirmation hearing: the Reeds listed their "actual current numbers" in Schedule J (filed in July 2013), while the tax return represented their expenses from 2012. 7/11/13 Tr. [Dkt. 150] at 3; *see also* R. 1-4, Am. Schedule J [Dkt. 129] (filed 7/2/13). Again relying on an alleged discrepancy between the plan and the Reeds' 2012 tax return, Sutton also argues that the Reeds underreported their Social Security income.[5] *See* Appellant's Br. at 14. But again, as explained at the confirmation hearing, this discrepancy is also a product of comparing the 2012 tax return (which lists their gross Social Security amount) with the Sixth Amended Plan (which represents the Social Security check

---

[5]Sutton also argues that the bankruptcy court ignored the months that the Reeds failed to report their rental income. *See* Appellant's Br. at 16. But the bankruptcy court *did* consider this possible discrepancy. As the Reeds' attorney explained in response to the bankruptcy court's question on precisely this issue, the Reeds gave Sutton their *current* rent-roll, which is what their amended Schedule I was based on. *See* 7/11/13 Tr. [Dkt. 150] at 4.

6

that the Reeds actually receive after Medicare expenses are deducted). *See* 7/11/13 Tr. [Dkt. 150] at 3.

Sutton next argues that in addition to allegedly inflating their expenses listed in Schedule J, the Reeds also omitted "numerous" expenses. *See* Appellant's Br. at 14-15. Sutton, however, only provides two specific examples. Their 2012 tax return showed that the Reeds had paid for an adult child's college tuition and had also paid the real-estate taxes on their mother's residence, neither of which appeared on their Schedule J list of expenses. *See id.* at 14. Again, these discrepancies stem from Sutton's relying on the 2012 tax return. The Reeds paid their child's college tuition in 2012, but then could not afford to continue paying it after they filed for bankruptcy. *See* 7/11/13 Tr. [Dkt. 150] at 13-14. Likewise, the Reeds no longer pay their mother's real-estate taxes. *See id.* at 14 ("[W]e have listed their current expenses."). In other words, both expenses were no longer bankruptcy expenses that they needed to list in Schedule J.

Moving on from Schedule J, Sutton argues that the 2.59% minimum return to unsecured creditors under the Sixth Amended Plan is further evidence of bad faith. *See* Appellant's Br. at 15, 17. The bankruptcy court, too, was troubled by this "very low percentage." 7/11/13 Tr. [Dkt. 150] at 4. But the Reeds' attorney explained to the court that this low percentage resulted from the Reeds' maintaining a reserve in case a tenant, for example, stopped paying rent (the Reeds' primary source of income) or if they had to make repairs on the rental property. *See id.* at 5; *see also* Am. Schedule J [Dkt. 129] ¶ 17. The Reeds had even considered holding a larger

7

reserve, but ultimately reduced it to the amount in the amended Schedule J so that their payments to creditors could be larger. *See* 7/11/13 Tr. [Dkt. 150] at 5. The Reeds' lawyer importantly noted that even at this low percentage, it guarantees that the Reeds' unsecured creditors will receive at least as much as they would if the Reeds had liquidated their debt in a Chapter 7 proceeding. *See id.*; *see also* 11 U.S.C. § 1325(a)(4) (requiring courts to confirm a plan if the amount recovered by unsecured creditors "is not less than the amount that would be paid on such claim[s] if the estate of the debtor were liquidated under chapter 7").

Finally, Sutton argues that the long delay in confirming the Reeds' final plan and all of the many changes that the Reeds made to their proposed plans and schedules demonstrate that they acted in bad faith. *See* Appellant's Br. at 14-17. It is true that the Reeds' bankruptcy case was pending for thirteen months before the bankruptcy court finally confirmed their plan. But Sutton points to nothing in the record suggesting that the Reeds caused these continuances and delays in bad faith. Instead, amending bankruptcy schedules is permitted "as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009. And as the bankruptcy court recognized in the confirmation hearing, these kinds of changes are common for small-business owners: "[t]he Chapter 13 plans, the budgets, the schedules typically move. The small businesses typically vary constantly. I do find that the debtors are making a good faith effort here to confirm a plan." 7/11/13 Tr. [Dkt. 150] at 15-16.

Satisfied with these explanations, the bankruptcy court confirmed the Reeds' Sixth Amended Plan. *Id.* at 6, 16; Order Confirming Plan [Dkt. 139]. It is true that

8

the bankruptcy court did not recite, point by point, all of the reasons for confirming the plan. But that does not mean that the court committed clear error. The discrepancies were all explained at the confirmation hearing. The bankruptcy court could rely, for example, on the explanation about the time gap between the 2012 tax return and the amended Schedule J. The omitted expenses were also explained because they were not part of the plan. Moreover, the reports in the schedules, all which were sworn, were sufficient for the bankruptcy court to rely on without committing clear error. *Cf. Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (explaining that appellate courts must still give deference to a trial court's factual findings even when they "do not rest on credibility determinations, but are based instead on . . . documentary evidence or inferences from other facts"). Although the bankruptcy court could have asked for more proof, it did not need to. It was therefore not clear error for the bankruptcy court to find that the Reeds acted in good faith and to confirm the Sixth Amended Plan.

### B. Denial of Motion to Lift the Stay

During the bankruptcy proceedings, Sutton also filed a motion to lift the stay, arguing that the Reeds failed to make adequate-protection payments and to pay the property's post-petition taxes. *See* Appellant's Br. at 17; *see also* Mot. Relief from Stay [Dkt. 38] at 3. Now on appeal, Sutton also argues the plan was not feasible because of the value of the property and that the delay in confirming a plan also supports her argument that the bankruptcy court should have lifted the stay. *See* Appellant's Br. at 17. None of these arguments has merit.

First, Sutton *did* receive adequate-protection payments, as the bankruptcy court ordered. Order Enforcing Required Adequate Protection Payment [Dkt. 102]; *see also* Sixth Am. Plan [Dkt. 130] at 6. And although Sutton did pay the Reeds' property taxes to prevent a tax foreclosure on the property, the Reeds included that debt in the plan. *See* 7/11/13 Tr. [Dkt. 150] at 15; Sixth Am. Plan [Dkt. 130] at 6. Next, Sutton's argument about the value of the property impacting the feasibility of the plan was resolved when the bankruptcy court held a valuation hearing and determined that the property "was worth at best $140,000." *See* 7/11/13 Tr. [Dkt. 150] at 15. The Sixth Amended Plan listed that revised amount and also included 5% interest, which the bankruptcy court held was appropriate. *See id.* And finally, as discussed above, the bankruptcy court reasonably found that the delay in confirming the plan was not caused by the Reeds acting in bad faith. In short, just as above, the bankruptcy court did not commit clear error in any of its factual findings, and it did not abuse its discretion in denying Sutton's motion to lift the stay.

## IV. Conclusion

For the reasons stated above, the Court holds that the bankruptcy court's finding that the Reeds proposed their Sixth Amended Plan in good faith was not clear error. The Court therefore affirms the bankruptcy court's orders denying Sutton's motion to lift the stay and confirming the Reed's Chapter 13 plan.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 20, 2014